Filed 5/14/21  P. v. Owens CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>IJUMAA OWENS,<br><br>　　　Defendant and Appellant. | B305369<br><br>(Los Angeles County<br>Super. Ct. No. BA477985) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark S. Arnold, Judge. Affirmed.

Nicholas Seymour, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Roberta L. Davis and William H Shin, Deputy Attorneys General, for Plaintiff and Respondent.

_____

# INTRODUCTION

A jury convicted Ijumaa Owens of robbing a store after he went behind the counter, caused the store's employee to fear for her life, and took money from several cash registers. Owens argues the trial court committed three instructional errors. We conclude there is no error, no prejudice, and no reason to reverse.

# FACTUAL AND PROCEDURAL BACKGROUND

A. *Owens Robs a Store*

One Saturday morning, a little before noon, Owens walked into the store of a prepaid wireless service provider and began, or pretended, to look at phones. Owens was wearing a black "hoodie sweater" or jacket with pockets in the front. Only one employee, Georgina Hernandez, and one customer, Stephanie White, were in the store. The store had four cash registers. Each register had $150 in cash at the beginning of the day, although by the time Owens entered the store, Hernandez had added cash to her register from customers who had purchased phones earlier in the morning. Each register had a key the employees left in the key hole so they could turn the key and open the register.

White had purchased a cell phone, and Hernandez was helping her transfer her email and contact information from her old phone to her new phone. Hernandez asked Owens if she could help him. Owens, who is over six feet tall, walked up to the counter and spoke to Hernandez, who is five feet three inches tall. Owens had his hands in the front pockets of his jacket.

Owens gave Hernandez a phone number and said he wanted to pay a phone bill. Hernandez entered the number

2

Owens gave her into her computer, but learned the number was associated with another carrier. Owens gave Hernandez another phone number, but it too was associated with another carrier. Hernandez thought it was unusual Owens gave her two different phone numbers; when customers pay a bill at the store, they usually know their phone number.

Owens pushed through the swinging, "saloon-style" doors that led to an employee-only area behind the counter, keeping one or both of his hands in his pockets. Hernandez was scared that, because Owens had his hands in his jacket pockets, he had "a weapon or something on him." Hernandez testified at trial that she believed Owens had a weapon based on how he was holding his hands in his pocket, which made her fear for her life, but also (on cross-examination) that Owens did not point his pocket at her as if he was pointing a weapon. White, the customer, testified that Owens had his hands in his pockets and that, while she was speaking with her son on her old cell phone, she said to him, "He has his hands in his pocket."

Owens told Hernandez to give him the money. Hernandez was scared Owens would hurt or kill her. Hernandez backed away from Owens, threw her hands up in the air, palms facing forward, and said, "Take whatever you want." She felt she had no choice but to give Owens the money, and she told Owens to take everything but not to hurt her. White, who was still on the phone with her son, said "He's robbing the store." White ran out, leaving Hernandez alone with Owens.

Owens turned the key in Hernandez's register, opened the register, and took all the cash. Owens began to leave, but returned to take the cash from two of the remaining three registers. Owens walked past Hernandez and said, "You are

3

good," which Hernandez understood to mean he was not going to hurt her.

As soon as Owens left the store, Hernandez locked the front door, pushed the alarm, and called the police.[1] When the police arrived, Hernandez unlocked the front door and explained what had occurred.

A police detective interviewed Hernandez the following Monday. Hernandez, who was still upset, told the detective that Owens had said, "Give me the money." Hernandez also said that Owens had "placed his hands in his jacket pocket and simulated a handgun" and that he "pointed something . . . in his jacket pocket toward her that she believed to be a handgun."[2] The detective also picked up a surveillance video at the store.

B. *Owens Is Followed and Caught*

Meanwhile, after White ran out of the store, she called the 911 emergency operator as she was running back to her car. She got into her car, locked the doors, and soon saw Owens walk calmly past her. White drove her car and followed Owens for 10

---

[1] The prosecutor played for the jury the recording of Hernandez's call to the 911 emergency operator, where she told the operator Owens said "Give me the money," and the video of the incident taken by the store's surveillance camera. Hernandez testified at trial that watching the video made her want to cry. White testified that watching the video gave her "chills."

[2] The detective clarified that, when he interviewed Hernandez, he simulated holding his index fingers and thumb in a gun-like position and that Hernandez agreed Owens had made that gesture.

4

to 15 minutes, as she continued to speak with the 911 operator. White said Owens appeared "very calm," was walking as though he was taking a stroll, and showed no concern he would be caught.

Eventually several police cars arrived with their lights and sirens off. White identified Owens, who by that time was counting money, by pointing to him through her car window. The officers told Owens to stop. When Owens saw the police officers, he looked directly at White and ran. The officers pursued him, some on foot and some in a patrol car. White parked her car in the middle of the street, got out, and joined the pursuit. The officers quickly captured and handcuffed Owens, and White "got down in his face and told him, 'Don't you ever rob no place again that I'm in.'"[3] One of the officers searched Owens and recovered $706 in currency and coins (some in a coin wrapper) from his pockets, but no weapons. Hernandez identified Owens in a field show-up.

C.    *Owens Gives His Version*

Owens testified that, 10 or 20 minutes before he went to the wireless service provider store, he had smoked phencyclidine (PCP), which he described as a "tranquilizer . . . for bodybuilders," and that he was feeling the effects of the drug when he entered the store. Owens stated that he had come from a nearby memorial service for his friend, Nipsey Hussle. He said that he had argued with his girlfriend and that he went to the store with $55 in his hand, not to rob the store, but to pay his

---

[3]    White subsequently requested, and the wireless service provider agreed to give her, the new phone she was purchasing when the robbery occurred without charge.

5

girlfriend's phone bill. He said that, when he walked into the store, his hands were "seeable" and not in his pockets. He said that Hernandez asked if he needed any assistance and that he stated he was there to pay a bill. Owens testified that he gave Hernandez his girlfriend's phone number twice and that he looked at the "call log" on his phone to confirm the number, but that Hernandez said "the number didn't comply with her computer." Owens said that the women in the store smirked and laughed at him and that he became frustrated because he knew the phone number was correct.

Owens testified he walked through the "slinging, Western-style doors" and behind the counter. He said that he was "still high" when he walked through the doors and that, although he did not know what was going through his mind, he went behind the counter to see if Hernandez was typing the correct phone number into the computer. Owens said that he had been listening to music on a speaker around his neck and was in his "own little zone," but that he could not understand why he was having a problem paying the phone bill. He denied saying "Give me the money" or pointing from his pockets at Hernandez. According to Owens, Hernandez said, "Get what you want" and "Take the money and leave." Owens testified that he took the money from the cash register because Hernandez "suggested it" and offered the money. Owens said that he was not going to take any money from the cash register, but that Hernandez "kept offering the money out of the cash register," which Owens admitted was "strange."

Owens had no explanation for why he started to leave after taking cash from one register but returned through the swinging doors to take cash from the other registers. Watching the

6

surveillance video, Owens said he must have been "out of it" because he was moving "like a slur, slurring" and without "straight posture." He said the video showed him walking as though he was "floating or something," which he considered an effect of PCP. Owens said he was not trying to threaten Hernandez or place her in fear when he took the money. Owens admitted that he stole money from the store, but stated that it was because he was under the influence of PCP.

Owens stated that when he walked out of the store he felt like he was "going to pass out." He explained the effects of PCP: "It's kind of like someone put you in a headlock and didn't let you go. The pressure, you just keep moving or you'll black out." Owens said that, when the police arrived, he ran because he saw "someone with a gun or something."

D.    *Owens's PCP Use Is the Subject of Rebuttal Testimony*

After Owens testified, the prosecutor asked permission to present testimony on rebuttal that Owens was not under the influence of PCP, either by the officers who arrested Owens (based on their background, training, and experience) or by a drug recognition expert. In particular, the prosecutor wanted to present evidence "that someone who is under the influence of PCP does not black out." The court denied the request in part, ruling that the prosecutor could call the officers to say Owens did not "exhibit any symptomology" of PCP, but that she could not call a drug recognition expert because "no witness can say that another witness is lying." The court stated there was no reason for the prosecutor "to put on a drug recognition expert" because "the jury is going to be told that . . . voluntary intoxication will not be a defense in this case."

7

The next morning the prosecutor recalled one of the officers who arrested Owens, who testified about his training and experience as a certified drug recognition expert. The officer testified he observed no signs or symptoms that would indicate Owens was under the influence of PCP. He stated Owens walked with a normal stride, spoke coherently and without slurring, had no chemical odor, and did not have a blank stare. The officer opined Owens was not under the influence of PCP. He also said that, based on his interviews of people who have used PCP, "they're fully aware of what's going on around them, they just don't have any control physically," and that "there's no blackouts and come back into consciousness or anything like that."

E.     *Owens Is Convicted and Sentenced*

The jury found Owens guilty of second degree robbery (Pen. Code, § 211),[4] and Owens admitted he had two prior convictions for felonies that were serious or violent felonies within the meaning of the three strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)) and serious felonies within the meaning of section 667, subdivision (a)(1). The trial court dismissed one of the prior serious or violent felony convictions for purposes of the three strikes law. The court sentenced Owens to a prison term of 16 years, consisting of the middle term of three years, doubled under the three strikes law, plus 10 years for the two prior serious felony convictions under section 667, subdivision (a)(1). Owens appealed.

---

[4]     Statutory references are to the Penal Code.

# DISCUSSION

### A. *The Trial Court Did Not Err in Refusing To Instruct on Voluntary Intoxication*

#### 1. *Relevant Proceedings*

Counsel for Owens requested an instruction on voluntary intoxication. The court considered counsel's request in chambers, but subsequently summarized their discussion on the record. Counsel for Owens argued that robbery was a specific intent crime, that voluntary intoxication was relevant to the issue of Owens's intent to steal, and that Owens's testimony he was under the influence of PCP supported giving the instruction.

The trial court denied the request, finding that any evidence of Owens's voluntary intoxication was "negligible." The court stated: "[Owens] testified that he has a specific recollection of coming from the mourning of Nipsey Hussle. He recalls that he was wearing a Bluetooth speaker and how he was wearing it on a sling. He remembers walking into the store and looking at his cell phone as he walked in. He remembers that he was there to pay his cell phone bill. He remembers the specific amount of money that he had. He recalls giving the two numbers to the victim. He also recalls wanting to look at the computer to make sure that she was typing in the right number. He recalls what the victim said to him. He recalls the victim laughing. He recalls walking behind the counter. He recalls the victim saying to him, 'take the money and leave.'"

The court further stated: "After that, it's a complete blank. He doesn't recall taking the money. He is not aware of the police. He exits the store and is sweating and walking. He doesn't recall

where he went.  He doesn't recall running.  It's just not credible and not believable that, . . . if he was under the influence, [it] affected his specific intent to steal at the time that he committed the crime.  Giving the defendant—putting him in the best possible light, if he had been smoking PCP, then it didn't hit him until after he walked out of the store.  It certainly didn't affect him while he was in the store; because if it did, he wouldn't have the remarkable memory of the details of what occurred prior to walking into that store and what occurred in the store up until that time that he walks behind the counter."

### 2. *Substantial Evidence Did Not Support Giving an Instruction on Voluntary Intoxication*

Owens argues his "testimony provided substantial evidence that he was intoxicated and that the intoxication affected him and his formation of specific intent."  Citing one of the trial court's statements, Owens asserts that the trial court's "denial of the instruction was on the basis that the evidence was not credible, not that it was insubstantial."

A defendant is entitled to a voluntary intoxication instruction "'only when there is substantial evidence of the defendant's voluntary intoxication and the intoxication affected the defendant's "actual formation of specific intent."'"  (*People v. Verdugo* (2010) 50 Cal.4th 263, 295; see *People v. Myles* (2012) 53 Cal.4th 1181, 1217; *People v. Olivas* (2016) 248 Cal.App.4th 758, 770-771.)  "[A]n intoxication instruction is not required when the evidence shows that a defendant ingested drugs or was drinking, unless the evidence *also* shows he became intoxicated to the point he failed to form the requisite intent or attain the requisite mental state."  (*People v. Ivans* (1992) 2 Cal.App.4th

10

1654, 1661; see *People v. Miller* (1962) 57 Cal.2d 821, 830-831 ["The mere fact that a defendant may have been drinking prior to the commission of a crime does not establish intoxication or require the giving of a requested instruction thereon."].) Substantial evidence in this context means evidence from which reasonable jurors could have concluded there was sufficient intoxication to negate the requisite criminal intent. (*People v. Carr* (1972) 8 Cal.3d 287, 294; see *People v. Marshall* (1996) 13 Cal.4th 799, 848 ["what is required is evidence from which a reasonable jury could conclude defendant's mental capacity was so reduced or impaired as to negate the required criminal intent"].)

The trial court did not err in ruling the evidence in support of Owens's voluntary intoxication theory was insubstantial or, in the court's words, "negligible." There was substantial evidence that Owens ingested PCP (Owens's testimony). But there was no substantial evidence Owens's use of PCP affected him to the extent he could not form the intent to steal. Owens walked into the store, approached the counter, had a conversation with Hernandez, gave her two invalid phone numbers, looked at (or pretended to look at) his cell phone to confirm he gave Hernandez the right numbers, pushed through the counter doors, entered an area customers were not allowed, (accepted an invitation from Hernandez to take or) took money from a cash register, started to leave the store, returned to take money from two more cash registers, communicated to Hernandez that he was not going to hurt her, walked out of the store, counted his loot as he walked down the street, and fled from law enforcement. There was no evidence his PCP consumption had any effect on his ability to do any of these things or to form an intent to permanently deprive

11

Hernandez of the money he took. (See *People v. Caldwell* (1984) 36 Cal.3d 210, 225 [a "defendant's actions may refute evidence" of voluntary intoxication]; *People v. Spencer* (1963) 60 Cal.2d 64, 88-89 ["'Actions of a defendant may completely refute his testimony as to his inability to form an intent to do the thing which he did.'"]; *People v. Olivas, supra,* 248 Cal.App.4th at p. 772 [even if there was "substantial evidence that defendant was voluntarily intoxicated," he "offered no evidence at trial to demonstrate how that intoxication might have resulted in his inability to formulate the specific intent necessary to" commit the crime].)

Owens did mention that PCP "sometimes . . . makes you hallucinate," but he did not say he was hallucinating when he was taking the money from the cash registers. (See *People v. Williams* (1997) 16 Cal.4th 635, 677-678 [even if the "scant evidence of defendant's voluntary intoxication," that the "defendant was 'probably spaced out' on the morning of the killings" and that "he was 'doped up' and 'smokin' pretty tough then,'" qualified as substantial evidence, it did not require instruction on voluntary intoxication where "there was no evidence at all that voluntary intoxication had any effect on defendant's ability to formulate intent"]; *People v. Marshall, supra,* 13 Cal.4th at p. 848 ["Although the offenses were committed after defendant had gone virtually without sleep for approximately 24 hours, and after he had drunk an unspecified number of alcoholic drinks over a period of some hours, evidence of the *effect* of defendant's alcohol consumption on his state of mind is lacking."]; *People v. Caldwell, supra,* 36 Cal.3d at p. 225 [testimony that the defendant appeared "lethargic and . . . drifting off to sleep, leading [the sheriff's sergeant] to suspect him

of being under the influence of a drug, perhaps PCP," was insufficient to justify an instruction on voluntary intoxication where the defendant "behaved in a calm, deliberate manner during the robbery" and "appeared rational" in responding to law enforcement].) Indeed, Owens remembered almost all of his actions in detail, including taking the money from the cash register; he just did not recall why he did it (other than Hernandez said he could). (See *People v. Ivans*, *supra*, 2 Cal.App.4th at p. 1662 [substantial evidence did not support an instruction on voluntary intoxication where, even though the defendant testified "he had been high on speed for a month and had been awake for three or four days," the defendant "gave detailed testimony about the events" on the morning of the crime].) A defendant's failure to remember every detail of a crime is not substantial evidence the defendant was unable to form the specific intent to commit the crime.

To be sure, as Owens correctly points out, the trial court stated that the evidence Owens's voluntary intoxication affected his specific intent to steal was not credible or believable. That was probably not the best choice of words. (See *People v. Mitchell* (2019) 7 Cal.5th 561, 583 ["'In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether "there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt."'"]; *People v. Young* (2005) 34 Cal.4th 1149, 1200 ["The trial court's determination of whether an instruction should be given must be made without reference to the credibility of the evidence."].) In context, however, the court's statements reflect a ruling there was no substantial (i.e., there was "negligible") evidence that whatever

13

PCP Owens may have ingested affected his ability to form the specific intent to steal cash from the three registers. (See *People v. Wilson* (2005) 36 Cal.4th 309, 331 ["'Substantial evidence is "evidence sufficient 'to deserve consideration by the jury,' not 'whenever *any* evidence is presented, no matter how weak.'"'"]; see also *People v. Powell* (2018) 6 Cal.5th 136, 164.)

Owens argues "the prosecutor's request to and subsequent admission of evidence countering [Owens's] testimony regarding intoxication serves as an admission that substantial evidence was submitted." It does not. The trial court allowed the prosecutor on rebuttal to introduce evidence on the issue of whether Owens exhibited any symptoms of being under the influence of PCP "to impeach" Owens's testimony he had taken PCP. The officer who testified on rebuttal may have gone beyond the trial court's ruling, but counsel for Owens did not object to most of the officer's testimony, and on appeal Owens does not challenge its admission. And there was no testimony on rebuttal about whether whatever amount of PCP Owens smoked affected his ability to form the specific intent to steal.

## B. *The Trial Court Did Not Err in Instructing on Robbery*

### 1. *Relevant Proceedings*

The trial court instructed the jury on robbery with CALCRIM No. 1600. In particular, the court stated: "In order to prove that the defendant is guilty of [robbery], the People must prove that: 1. The defendant took property that was not his own; 2. The property was in the possession of another person; 3. The property was taken from the other person or his or her immediate

14

presence;  4. The property was taken against that person's will;  5. The defendant used force or fear to take the property or to prevent the person from resisting;  6. When the defendant used force or fear, he intended to deprive the owner of the property permanently."  The court also instructed the jury that "fear, as used here, means fear of injury to the person . . . himself or herself" and that "a store employee who is on duty has possession of the store owner's property."

Citing *People v. Morehead* (2011) 191 Cal.App.4th 765 (*Morehead*), trial counsel for Owens requested a pinpoint instruction stating that "the genesis of fear must be the defendant's actions, and not something created by the victim." The court stated that it was "a fair request" and that it was "a proper pinpoint instruction to give to the jury."

Because the court and counsel had several conferences in chambers that were not transcribed by a court reporter, it is not entirely clear what happened next.  The record suggests that the prosecutor prepared a special instruction based on *Morehead* and that the court added language counsel for Owens had requested, which was that "it must be established that there's conduct, words, or circumstances reasonably calculated by the defendant to produce fear."

The court ultimately gave the following six-sentence instruction on fear:  "[1] The element of fear for the purpose of robbery is satisfied when there is sufficient fear to cause the victim to comply with the unlawful demand for his or her property.  [2] All that is necessary is [that] the record show conduct, words, or circumstances reasonably calculated *by the defendant* to produce fear.  [3] It is not necessary that there be direct proof of fear; fear may be inferred from the circumstances

15

in which the property is taken. [4] The requisite fear need not be the result of an express threat or use of a weapon. [5] Resistance by the victim is not a required element of robbery.

[6] Intimidation of the victim equates to fear."[5] (Italics added.) As Owens concedes, it is not clear whether his trial counsel objected to this instruction.

[5] The language in the instruction was from the court's opinion in *Morehead*, *supra*, 191 Cal.App.4th 765. There the court stated: "'[1] The element of fear for purposes of robbery is satisfied when there is sufficient fear to cause the victim to comply with the unlawful demand for his property.' [Citations.] [3] It is not necessary that there be direct proof of fear; fear may be inferred from the circumstances in which the property is taken. [¶] If there is evidence from which fear may be inferred, the victim need not explicitly testify that he or she was afraid. [Citations.] Moreover, the jury may infer fear "'from the circumstances despite even superficially contrary testimony of the victim.'" [¶] [4] The requisite fear need not be the result of an express threat or the use of a weapon. [Citations.] [5] Resistance by the victim is not a required element of robbery [citation], and the victim's fear need not be extreme to constitute robbery [citation]. [2] All that is necessary is that the record show ""conduct, words, or circumstances reasonably calculated to produce fear . . . ."" [¶] [6] Intimidation of the victim equates with fear. [Citation.] An unlawful demand can convey an implied threat of harm for failure to comply, thus supporting an inference of the requisite fear." (*Id*. at p. 775.) The language requested by counsel for Owens, and added by the court, was the italicized phrase "by the defendant" after "reasonably calculated to produce fear."

## 2. *The Special Instruction on Fear Was Not Erroneous*

Owens argues that the special instruction on fear "had the effect of lightening the prosecution's burden of proving every element beyond a reasonable doubt . . . ." Owens contends the instruction did so by "failing to acknowledge that [the defendant] must *cause* the fear, and that he must do so at the time he has the specific intent for robbery," and instead directing "the jury to consider whether Ms. Hernandez was in fear, an undisputed fact, or was intimidated, without finding all the required elements of robbery."

Owens challenges three parts of the special instruction. First, he argues that the first sentence of the instruction, which stated that the element of fear for robbery "is satisfied when there is sufficient fear to cause the victim to comply" with the demand, erroneously allowed "the jury to find that Ms. Hernandez's fear alone satisfies several elements of robbery, without considering [Owens's] conduct." Owens's argument, however, is based on an unreasonable reading of the instruction.

""It is fundamental that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions." [Citation.]' [Citation.] ""A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant. [Citations.]' [Citation.] "'[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.""""" (*People v. Covarrubias* (2016) 1 Cal.5th 838, 905.)

17

Here, the special instruction on fear followed the court's general instruction on robbery, CALCRIM No. 1600, which instructed the jury, among other things, that the People had to prove that "the defendant used force or fear to take the property" and that, when "the defendant used force or fear, he intended to deprive the owner of the property permanently." The first sentence of the special instruction gave the jury additional guidance on the meaning of the term "fear" for purposes of robbery. It is not reasonably likely the jurors understood it to mean they could find the prosecutor met her burden of proof on the element of fear by finding Hernandez was in fear, but not because of anything Owens did. Indeed, as stated the court instructed the jury with the optional sentence of CALCRIM No. 1600 that provides, "Fear, as used here, means fear of injury . . . to the person himself or herself," and Owens does not argue this instruction allowed the jury to find the element of fear without considering Owens's conduct. It is not reasonably likely the jury understood either instruction in this way.[6]

Second, Owens argues the third and fourth sentences of the instruction, which stated that fear may be inferred from the circumstances and that fear need not be caused by an express threat or weapon use, erroneously asked "the jury to find fear without finding [Owens] performed an act to cause it" and omitted "the finding of [Owens's] intent when he acted." This argument has the same defect: It is not reasonably likely the jurors understood they could find the element of fear based on the circumstances, but without considering Owens's role in creating

---

[6] Owens also argues this part of the special instruction "presupposes an 'unlawful demand,'" but he does not explain, or even argue, why this is so.

18

those circumstances, with or without a threat or a weapon. These instructions provided further guidance on the meaning of the term "fear" for purposes of robbery, and the court's instruction based on CALCRIM No. 1600 told the jurors that the People had to prove "the defendant" used fear to take the property and prove that, when "the defendant" did so, he intended to take the property permanently.

Third, Owens argues the sixth sentence, which equated intimidation with fear, lowered "the evidentiary burden to prove the crime by equating intimidation to fear." The instruction was not erroneous. In the context of robbery, intimidation and fear are synonymous. (*People v. Bordelon* (2008) 162 Cal.App.4th 1311, 1319; see *In re Jeremiah S.* (2019) 41 Cal.App.5th 299, 308 ["robbery can be accomplished by fear alone [citation], which can consist of mere intimidation without the use of threats, so long as it facilitates the taking of the property"]; *People v. Mullins* (2018) 19 Cal.App.5th 594, 604-605 ["intimidation . . . is conduct reasonably calculated to produce fear"].) If the prosecution proves the defendant intimidated the victim, the prosecution has proven the defendant used fear.

The instructional problem arises, not where (as here) the court instructs the jury that fear and intimidation are the same, but where, as occurred in *People v. Davison* (1995) 32 Cal.App.4th 206 (on which Owens principally relies), the court instructs the jury that the terms are different. In *Davison* the trial court instructed the jury "that robbery is a taking 'accomplished by means of force or fear.'" (*Id.* at p. 211.) But the court also instructed the jury pursuant to former CALJIC No. 9.40 that one of the elements of robbery was "a taking 'accomplished either by force, violence, fear or intimidation'" and that, "'[w]here

19

intimidation is relied upon, it must be established by proof of conduct, words or circumstances reasonably calculated to produce fear.'" (*Davison,* at p. 213.) The court in *Davison* held that these instructions were erroneous because they "created ambiguity as to whether 'fear' and 'intimidation' are different concepts for purposes of robbery and whether the jury had to find that [the victim] was, in fact, afraid in order to reach a guilty verdict." (*Ibid.*) The court traced the problem to the then-current version of CALJIC No. 9.40, which (unlike the prior version of that pattern instruction)[7] defined "the element simply as a taking 'accomplished either by force, violence, fear or intimidation,'" thus arguably conveying "the idea that each of these terms represents a different concept, and that conviction is proper if the jury finds any one of the four." (*Davison,* at p. 214.) Here, the trial court gave the correct instruction: fear and intimidation are the same concept. (See *ibid.* ["If the instruction made clear that 'fear' and 'intimidation' were synonymous, further definition of the latter term would be unnecessary."].)

Owens also argues that the "use of appellate opinions," like the one his trial counsel cited to the court (*Morehead, supra,* 191 Cal.App.4th 765), for "pinpoint instruction was error." Owens cites *People v. Colantuono* (1994) 7 Cal.4th 206, where the Supreme court recognized "the danger of assuming that a correct statement of substantive law" in an appellate opinion "will

7 The prior version of CALJIC No. 9.10 (4th ed. 1979) "defined this element of the crime as a taking 'accomplished either by force *or* violence *or by* fear or intimidation *or by* both . . . .'" (*People v. Davison, supra,* 32 Cal.App.4th at p. 214, italics in original.)*

* The italics are in the original of the *Davison* opinion, not the original text of the pattern jury instruction.

provide a sound basis for charging the jury." (*Id.* at p. 221, fn. 13.) The Supreme Court stated: "The discussion in an appellate decision is directed to the issue presented. The reviewing court generally does not contemplate a subsequent transmutation of its words into jury instructions and hence does not choose them with that end in mind. We therefore strongly caution that when evaluating special instructions, trial courts carefully consider whether such derivative application is consistent with their original usage." (*Ibid.*)

The record does not reflect how much caution the trial court took in formulating the special instruction based on *Morehead*; most of the discussion of jury instructions was in chambers and not transcribed. But the trial court was cautious enough. The language from the court's opinion in *Morehead* the trial court used stated the law on robbery accurately. The only language the trial court added, "by the defendant," was proposed by Owens. The instruction did not include any out-of-context language from the *Morehead* opinion that may have misled or confused the jury.

  C. *The Trial Court Did Not Err in Instructing on the Lesser Included Offense of Theft*

   1. *Relevant Proceedings*

The trial court instructed the jury with CALCRIM No. 251 regarding specific intent. Although the court had not yet defined the crime of robbery, the court instructed the jurors: "The specific intent required for the crime of robbery is to deprive the owner of the property permanently or to remove the property from the owner's possession for so extended a period that the

owner would be deprived of a major portion of the value or enjoyment of the property." The court then stated that "the specific intent required for petty theft—" but stopped in mid-sentence, apparently realizing the court had not mentioned petty theft or described the concept of a lesser included offense. The court continued with this statement, which was not part of the pattern instruction: "And I'll tell you more about this. Petty theft is a lesser but included offense of robbery, so you're going to have the opportunity to decide whether the defendant is guilty or not of robbery. If you decide that he is not guilty of robbery, you can then consider whether he is guilty or not guilty of petty theft. Petty theft is a lesser crime." The court then described the specific intent required for petty theft (which was identical to the specific intent required for robbery).

The trial court subsequently instructed the jury with CALCRIM No. 3517 regarding how to deliberate and complete the verdict forms. The court instructed the jurors: "If all of you find that the defendant is not guilty of the greater charged crime of robbery, you may find him guilty of a lesser crime, petty theft, if you are convinced beyond a reasonable doubt that the defendant is guilty of that lesser crime, petty theft. A defendant may not be convicted of both robbery and petty theft. . . . It is up to you to decide the order in which . . . you consider each crime and the relevant evidence, but I can accept a verdict of guilty of a lesser crime, petty theft, only if you have found the defendant not guilty of the corresponding greater crime, robbery." The court also instructed the jury to follow the directions on the verdict forms and how to complete the forms.

2. *The Trial Court Did Not Err in Instructing the Jurors When They Could Consider the Lesser Included Offense of Theft*

Citing *People v. Kurtzman* (1988) 46 Cal.3d 322 (*Kurtzman*), Owens argues that the trial court's intra-CALCRIM No. 251 statement, that if the jurors decided Owens was not guilty of robbery then they could consider whether he was guilty of theft, was a directive to the jurors that, contrary to CALCRIM No. 3517, they could not consider or discuss theft "without first acquitting" him of robbery. Again, considering the court's instructions in their entirety, there is no reasonable likelihood the jury understood the instructions in this way. (See *People v. Covarrubias, supra,* 1 Cal.5th at p. 905.)

Contrary to Owens's contention, the trial court's statement did not preclude the jurors from considering or discussing the lesser included offense of theft until after they had reached a verdict on robbery. While the trial court did use the words "you can then consider" after the words "if you decide he is not guilty of robbery," the court did not tell the jurors they could not consider or discuss whether Owens was guilty of theft unless and until they reached a verdict on robbery. And the court made clear it was up to the jurors to decide the order in which they considered the crimes. The court's statement here stands in stark contrast to the statement by the trial court in *Kurtzman* that the jury had to "'unanimously agree on the second degree murder offense before *considering* voluntary manslaughter.'" (*Kurtzman, supra,* 46 Cal.3d at p. 328; cf. *People v. Olivas, supra,* 248 Cal.App.4th at p. 774 [trial court's instruction that the jury could not consider an "alternative charge" if they were deadlocked on a "more severe aggravated" charged count "had the

23

same effect on the jury as the [instruction] the *Kurtzman* court found had violated California's acquittal-first rule"];[8] *People v. Perez* (1989) 212 Cal.App.3d 395, 399 [trial court's statement to the jurors, "'you must resolve count I, the second degree charge, before you can consider the other charges,'" violated *Kurtzman*]; *People v. Hishmeh* (2020) 52 Cal.App.5th 46, 48 [trial court violated *Kurtzman* by twice instructing "the jury that unless it found the defendant not guilty of the charged crimes, it *could not consider* the lesser included offenses"].)

Moreover, any error in the court's instruction was harmless under the standard in *People v. Watson* (1956) 46 Cal.2d 818. (See *Kurtzman*, *supra*, 46 Cal.3d at p. 335 [applying the harmless error standard of whether it was "reasonably probable that a different result would have occurred had the contested instructions not been given"]; *People v. Olivas*, *supra*, 248 Cal.App.4th at p. 775 [applying "the *Watson* standard of prejudice" to *Kurtzman* error]; see also *People v. Berryman* (1993) 6 Cal.4th 1048, 1077, fn. 7 [*Kurtzman* error "appears to implicate California law only"], disapproved on another ground in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.) As the Supreme Court has recognized, there is an "inherent difficulty" (*People v. Fields* (1996) 13 Cal.4th 289, 309, fn. 7) in demonstrating prejudice from *Kurtzman* error: Because "[i]n the abstract" an erroneous instruction that a jury must acquit on the greater offense before considering the lesser offense "appears capable of *either* helping *or* harming *either* the People *or* the defendant," in any given case, "it will likely be a matter of pure conjecture whether the instruction had any effect, whom it affected, and what the effect was." (*Berryman*, at p. 1077, fn. 7.)

---

8       There is no indication here the jury was deadlocked.

24

In addition, the trial court's brief, off-script introduction to petty theft and the concept of a lesser offense, which included the reference to considering whether Owens was guilty of theft if the jury decided he was not guilty of robbery, was not included in the set of written instructions the court gave to the jury. (See *People v. Frederickson* (2020) 8 Cal.5th 963, 1026 ["'[t]o the extent a discrepancy exists between the written and oral versions of jury instructions, the written instructions provided to the jury will control'"]; *People v. Mills* (2010) 48 Cal.4th 158, 201 ["[b]ecause the jury was given the correctly worded instructions in written form and instructed with CALJIC No. 17.45 that '[y]ou are to be governed only by the instruction in its final wording,' and because on appeal we give precedence to the written instructions, we find no reversible error" (fn. omitted)].) Although the trial court did not instruct the jurors that the written instructions took priority over the oral instructions, the trial court instructed the jurors that it would provide a copy of the instructions for use in the jury room, and there is no dispute the court did so.

Finally, it is not reasonably probable that, had the court not used the words "if you decide he is not guilty of robbery" before the word "consider," the result of the trial would have been any different. Unlike many of the cases involving *Kurtzman* error, here the jurors did not ask any questions during deliberations or give any indication they were having trouble reaching a verdict, nor is there any suggestion the jurors in fact refused to discuss or consider theft until they had reached a verdict on robbery. (See, e.g., *Kurtzman, supra*, 46 Cal.3d at p. 328; *People v. Hishmeh, supra*, 52 Cal.App.5th at p. 51; *People v. Olivas, supra*, 248 Cal.App.4th at p. 772; *People v. Perez, supra*, 212 Cal.App.3d at p. 399.) And, compared to the court's isolated

and essentially parenthetical reference to "if you decide," the evidence that Owens used fear to steal money from the store's cash registers was strong. Owens did not happen to pick up some cash from an open cash register drawer as he walked by; he went behind the counter in a threatening manner, causing Hernandez to raise her hands in surrender, and robbed three cash registers before finally telling Hernandez he was not going to hurt her.[9]

## DISPOSITION

The judgment is affirmed.


SEGAL, Acting P. J.


We concur:


FEUER, J.          McCORMICK, J.[*]

---

[9]      Owens also argues the cumulative prejudice of the trial court's errors requires reversal. But because there was no error, there was no cumulative error. (See *People v. Cordova* (2015) 62 Cal.4th 104, 150 [cumulative effect of asserted errors was not prejudicial where "there was no error to accumulate"]; *People v. Avila* (2014) 59 Cal.4th 496, 520 [same].)

[*]      Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.